Marshall E. Livingston, J.
This proceeding is brought pursuant to section 745 of article 7 of the Real Property Actions and Proceedings Law to recover possession of real property by the tenant petitioner. Respondent concedes that the tenant was forcibly evicted from the premises following a fire which occurred February 5, 1968.
The original tenant, Noah’s Ark Auto Accessories, Inc. and its assignee, Phillips-Eckhardt Electronics Corporation, now known as Noah’s Ark, Division of Eckmar Corp., will be referred to at all times as Noah’s Ark, and the original landlord, Bull’s Head Plaza, Inc. and its assignee, Fred W. Geib, will be referred to hereafter as Geib.
A general background of the occurrences leading up to the fire of February 5, 1968 should be set forth as a prologue to the events upon which this proceeding is based.
Since 1959 and until the fire of February 5, 1968, Noah’s Ark had been a tenant of spaces designated as stores 9, 10, 11 and the second floor over store 9 in one of the buildings at the Bull’s Head Plaza, sharing a building with a coin laundromat to the north and a shoe store (Thom McAn) and a drug store (Daw’s) to the south. Noah’s Ark occupied approximately 7,250 square feet of floor space of which approximately 6,700 square feet was on the first floor.
*801 The building itself is of steel column and girder construction covered by a concrete roof, insulation and roofing material. The sidewalls were partitioned with two-by-four studding faced with plasterboard. The store front of about 60 feet was constructed of glass windows and doors set in aluminum frames. Across the rear of the sales area, about 75 feet from the front, was a partition behind which were two storerooms separated longitudinally by a hall and a stairway to a second story storeroom. A garage also was at the rear of the store, and the rear wall of the building was of cinder block construction.
Noah’s Ark leased the premises from Geib for a term of five years, commencing May 1, 1959. The lease provided for two extensions of five years each on the same terms, at the tenant’s option, at an agreed guaranteed minimum rental of $9,600 per year, or an annual rental equal to 4% of the tenant’s annual gross sales, whichever was larger.
Noah’s Ark had apparently given notice to Geib, exercising its option for the first five-year renewal of the lease.
On June 21, 1966, at a time when Noah’s Ark was in arrears in rental payments for at least three months, it filed a petition in bankruptcy in United States Bankruptcy Court, Western District of New York, seeking relief under chapter 11 of the Bankruptcy Act. Phillips-Eckhardt Electronics Corporation thereafter purchased the assets of Noah’s Ark, including its leasehold rights, and this arrangement was approved by the Bankruptcy Court on August 19, 1966. On August 30, 1966 the sale and assignment of leases was consummated by an order of said court.
In September of 1966, after the consummated assignment, Geib demanded the removal of the tenant from the premises, by notice. The matter was brought before the Bankruptcy Court because the termination notice related to the insolvency clause under the lease. By stipulation of both parties, the court entered an order declaring the termination notice void and of no effect.
About September 28, 1966 a proceeding was started by Geib in Monroe County Court against Noah’s Ark and PhillipsEckhardt to recover possession of his real property. It appears that even before that proceeding was started, Peter R. Geib, respondent’s son and conceded general agent, insisted, on August 30 and again on September 8, 1966, that the tenant quit the premises. On September 19, 1966, November 9, 1966 and January 9, 1967, notices to terminate the lease were also sent to Noah’s Ark by or in behalf of Geib. The petition in County Court was subsequently discontinued.
*802 It is apparent that since the early summer of 1966, when Noah’s Ark was behind in its rent, Geib has tried unsuccessfully to terminate the lease.
On February 5,1968, a fire occurred in the premises leased by Noah’s Ark, also damaging the Thom McAn shoe store on the south and a coin laundry on the north side of Noah’s Ark. The next day Noah’s Ark notified Geib in writing of the fire, pursuant to paragraph seventh of the lease, which provides as follows:
1 ‘ seventh. That the Tenant shall, in case of fire, give immediate notice thereof to the Landlord who shall thereupon cause the damage to be repaired forthwith; but if the premises be so damaged that the Landlord shall decide to rebuild, the term shall cease and the accrued rent be paid up to the time of the fire.”
On February 13, 1968 Geib’s attorneys (Exhibit 4), in his behalf, notified Noah’s Ark of his decision to rebuild and that the lease was thereby terminated. On March 15, 1968 Geib, by registered mail, again notified Noah’s Ark (Exhibit 3) of his .decision to rebuild and terminate the lease in accordance with the second clause of the above-quoted paragraph seventh.
On March 18, 1968 Noah’s Ark brought this proceeding by petition, in conformance with article 7 of the Beal Property Actions and Proceedings Law, to recover possession of the real property from which it had been evicted. Accordingly, a trial was had before me.
Petitioner’s prompt notice of a fire causing “ extensive damage ”, as provided by the fire clause of the lease, demanding that the landlord forthwith repair the premises, is conceded.
Geib’s answer denies the contentions of Noah’s Ark, and for an affirmative defense, urges that, as provided by paragraph seventh of the lease, the lease be terminated because the fire caused such extensive damage to the premises that he has decided to rebuild.
Noah’s Ark contends that Geib’s repeated attempts to terminate the lease from June, 1966 indicate that the present affirmative defense based on the notices set forth at Exhibits 3 and 4 is not founded in good faith and that Geib has not really decided to rebuild. Noah’s Ark claims in fact that Geib is not going to rebuild, but merely repair the building.
At the outset it is clear that the fire clause (par. seventh of the lease) constitutes an express agreement which excludes the operation of section 227 of the Real Property Law (see Matter of Manufacturers Trust Co. v. Bach, 32 Misc 2d 858 and cases cited therein).
Neither counsel nor I have been able to find any authority in New York construing the second part of paragraph seventh *803 of the lease. In this case the parties agreed that ‘' if the premises be so damaged that the Landlord shall decide to rebuild ” (italics supplied), the term shall cease. This language is the choice of the parties and must be construed accordingly.
Just what do these words mean? Must Greib, by a fair preponderance of the evidence, convince the court that a reasonable man, in the face of the “ extensive damages ” which occurred, would probably elect to rebuild rather than repair? Or, is it enough to show that in good faith Greib elected to rebuild?
This is not a case of total destruction, or substantial destruction, as has been considered in other cases (Leone v. Russo, 190 Misc. 984, affd. 275 App. Div. 674; Corbett v. Spring Garden Ins. Co., 155 N. Y. 389; General Outdoor Adv. Co. v. Wilson, 276 App. Div. 63).
Total or substantial destruction in my mind is quite different from being “ so damaged that the Landlord shall decide to rebuild ” (italics supplied).
Webster’s Third New International Dictionary, Unabridged (1966 ed., p. 1893), defines the word “ rebuild ” in this manner, “ to make extensive repairs to including the replacement of missing or defective parts; to restore to a previous state or condition ”.
Fire damage might well be extensive and still fall short of total destruction. In other words, the second part of the fire clause here gives a broader range for the exercise of Greib’s discretion than it would have if the clause had read, “ total destruction ’ ’.
The rule in New York respecting the interpretation of total destruction, however, furnishes a valuable yardstick to measure whether or not G-eib’s decision to rebuild was reasonable and justified because the premises were “ so damaged ”.
The standard as to total or substantial destruction applied in Leone v. Russo (supra) and Corbett v. Spring Garden Ins. Co. (supra) should be followed here. This provides that if the cost of restoration is more than one half of the value of the building just before the fire, then there is total destruction.
Noah’s Ark urges that General Outdoor Adv. Co. v. Wilson (276 App. Div. 63, supra) is authority for the proposition that other factors than the so-called 50% or ‘ ‘ marine rule ’ ’ may be used, and with this, I agree. However, in that case there were ample factual and equitable reasons for the court to reverse the judgment declaring the lease terminated. The opinion states (p. 65): “ The damage was not so severe as to render the premises untenantable and the plaintiff continued in occupancy thereof thereafter and to date, and, except for incidental incon *804 venience, substantially in the manner and extent as it had occupied and used them prior to the fire.” (In the ease at bar the premises were clearly untenantable.)
It also appears in the General Outdoor Adv. Co. v. Wilson case (supra, p. 66) that equitable consideration underlay the whole arrangement. The plaintiff there formerly owned the premises and sold them to the defendant for cash, plus the lease for five years with a like renewal period. For this reason, the court said: ‘' Moreover, the matter may not be said to turn solely upon the wishes of the owner or even his apparent financial interest. The interests of both parties are to be considered. The situation of the plaintiff who took this lease as a part of the consideration or price for which it sold the building, and its interest in the leasehold must be taken into account in determining whether it was reasonably practical to repair.”
The undisputed reconstruction cost of Noah’s Ark, as testified to by five subcontractors and one general contractor, who made appraisals of the loss for the New York Fire Adjustment Corporation of Buffalo, New York, amounted to a total of $58,732.82. These estimates were furnished item by item in considerable detail. The subcontractors’ estimates for glass, electrical work, plumbing, specialties and roofing totaled $24,563.43, plus the general contractor’s estimate of $34,169.39.
Mr. Thomas S. Wills, Jr., a qualified real estate broker and appraiser, testified that in April, 1967 he was employed by Monroe County Savings Bank to make an appraisal for mortgage loan purposes of the entire Bull’s Head Shopping Plaza. The fair market value of the entire property at that time was $261,000 for land and $939,000 for buildings.
Mr. Wills further testified that on February 4, 1968 the. fair market value of the Noah’s Ark building alone was $63,600. His estimate of value was based on the contribution which the Noah’s Ark space adds to the value of the entire plaza and excluded any value for land, land improvements or fixtures on the premises. He also stated that the fair and reasonable annual rental for these premises, having in mind the location of the store in the plaza, was $2.50 per square foot times approximately 6,540 square feet, or $16,350. This additional factor was considered by Mr. Wills in arriving at his pre-fire fair market value of the Noah’s Ark premises.
Noah’s Ark, in rebuttal, only offered evidence by a general contractor, Mr. Friederich, that the cost of a complete reconstruction of the Noah’s Ark store after the fire would be $124,-222.72, including demolition costs of $8,126. This cost was esti *805 mated by Mr. Friedericb by using a figure of $16 per square foot times the measured area of approximately 7,250 square feet, according to his testimony.
It should be noted that this rebuttal evidence by Mr. Friederich considered, only the reconstruction cost of the building, assuming it was demolished and completely rebuilt. His figure of $124,222.72 cannot be used as a value of the building before the fire. There is no basis for the inference that repairs of $58,732.82 represent less than half the rebuilding costs, and therefore, Geib must repair' and not rebuild. Noah’s Ark argues that the building was not substantially damaged. This is an untenable claim.
Noah’s Ark questions Geib’s good faith in attempting to terminate the lease because the premises were “ so damaged The contention is that Geib’s decision to rebuild and terminate was not made in good faith, but was rather an inflexible decision to get Noah’s Ark out of the premises for any reason.
The bitterness engendered between the parties is unfortunate. However, when the fair preponderance of the evidence shows, as it does here, that the fire damage sustained by the respondent’s building represents a cost of restoration of 93% of the value of the building before the fire, I cannot say that Geib is seeking to evade his responsibility to repair, as required by the first clause of paragraph seventh of the lease.
All the testimony, the photographs and other exhibits clearly indicate to me that the premises were so damaged that the landlord, in good faith, was justified in a decision to rebuild and thus terminate the lease.
Geib has carried the burden of proof on his affirmative defense. The two notices (Exhibits 3 and 4) of his intention to rebuild were direct and to the point.
Petitioner argues that Geib vacillates and is indecisive about rebuilding. It appears that Geib has not started his rebuilding project; however, an application for his benefit was made and a permit granted by the City of Rochester to ‘ ‘ repair fire damage” on the premises. Geib’s explanation is that after this proceeding was started, he decided to await its determination before commencing to rebuild, as he notified Noah’s Ark he had decided to do.
I know of no rule which, under these circumstances, would require an owner to begin rebuilding operations prior to the outcome of a lawsuit involving whether or not a decision had actually been made to rebuild. Such action might even be seen as a self-serving action and viewed dimly by a court. It is to Geib’s *806 credit that he awaits the decision of the court and the final outcome of this case before proceeding to rebuild.
G-eib’s decision to rebuild is reasonable under the circumstances and is binding on Noah’s Ark.
The petition is dismissed, and Geib is entitled to judgment on the counterclaim sought in his answer.